2026 IL App (2d) 250554-U
No. 2-25-0554
Order filed April 30, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

JULIE K., Plaintiff-Appellee,

v.

ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Kevin T. Busch, Judge, Presiding.
No. 25-MR-168

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy concurred in the judgment.
Justice McLaren specially concurred.

**ORDER**

¶ 1   *Held*:   The judgment of the circuit court is reversed where the circuit court erred in denying the Department's motion to dismiss plaintiff's complaint seeking administrative review as plaintiff failed to follow the requirements for issuance of summons pursuant to section 3-103 of the Administrative Review Law (735 ILCS 5/3-103 (West 2024)).

¶ 2   Plaintiff, Julie K., is the paternal great-aunt of R.K. After juvenile court proceedings were initiated by defendant, the Illinois Department of Children and Family Services (Department), when R.K. was born, plaintiff instituted two service appeals challenging the placement of R.K. with a foster family. Following a decision by the Department to maintain placement of R.K. with her foster family, and the decision of an Administrative Law Judge (ALJ) affirming that decision,

plaintiff sought administrative review of the placement decision. The Department moved to dismiss plaintiff's administrative complaint. After hearing the case on its merits, the circuit court of Kane County reversed the decision of the ALJ. The Department then instituted this appeal.

¶ 3 On appeal, the Department argues that (1) plaintiff failed to comply with the mandatory summons requirement; (2) plaintiff lacked standing to pursue a service appeal; (3) the Department's decision to maintain R.K.'s placement with her foster family was in R.K.'s best interests; and (4) the trial court erred by ordering the Department to place R.K. with plaintiff, rather than remanding to the Department. Because plaintiff failed to comply with the requirements for issuing summons in section 3-103 of the Administrative Review Law (735 ILCS 5/3-103 (West 2024)), we conclude that the trial court erred in denying the Department's motion to dismiss plaintiff's complaint for administrative review. Accordingly, we reverse on this basis alone and do not address the Department's remaining arguments.

¶ 4 I. STATEMENT OF FACTS

¶ 5 A. Background

¶ 6 R.K. was born on April 22, 2023. Juvenile court proceedings were initiated by the Department when R.K. was born. The Department has had custody of R.K. since the time of her birth. R.K. has a brother, J.K., who is three years older than her. J.K. lives with Rita K., plaintiff's mother and R.K.'s paternal great-grandmother. J.K. was placed with Rita K. shortly after his birth. The Department's first choice of placement for R.K. was with Rita K. so that she could reside with her sibling, but Rita K. declined placement of the child.

¶ 7 As noted, plaintiff is R.K.'s paternal great-aunt. Prior to and at R.K.'s birth, plaintiff expressed a willingness to foster R.K. However, plaintiff resides in Menomonee Falls, Wisconsin, approximately 125 miles away from St. Charles, Illinois, where Rita K., J.K., and R.K.'s biological

parents resided at the time. R.K. had no other family or fictive kin in Illinois willing to foster her. The Department determined that R.K. should be placed in a location closer to St. Charles, Illinois, to accommodate frequent visitation with J.K. and R.K.'s biological parents, as the permanency goal was return home. Accordingly, R.K. was placed with a traditional foster family in Crystal Lake, Illinois, about 25 miles from where her biological parents resided. The Department concluded that this placement was in accordance with its rule that when the permanency goal is return home, a child should be placed in reasonable proximity to the child's family, not exceeding 50 miles, to allow for visitation. See 89 Ill. Adm. Code 301.60(b)(2) (2015). R.K. was placed in the Crystal Lake home on April 24, 2023, two days after she was born. She has never lived with any other caregiver. Although the Department declined to place R.K. with plaintiff while the permanency goal was return home, it expressed a willingness to consider placement with plaintiff in the event that the permanency goal changed.

¶ 8     For the first several months of R.K.'s life, her biological parents were engaged in services, attending weekly visits with R.K., and working towards reunification. R.K.'s biological parents subsequently stopped participating in services, and on April 29, 2024, the juvenile court changed R.K.'s permanency goal to substitute care pending termination of parental rights.

¶ 9     Following the goal change, both plaintiff and R.K.'s foster parents expressed interest in adopting the child. Plaintiff also moved to intervene in the juvenile court case, seeking to have R.K. placed with her. The Department submitted a referral under the Interstate Compact on the Placement of Children to ensure that plaintiff had proper foster parent credentials in place under Wisconsin law. Plaintiff was thereafter approved.

¶ 10     In August 2024, the Department's regional clinical manager, Laura Stocco, prepared a clinical report reviewing R.K.'s case and placement considerations. On August 15, 2024, the

juvenile court denied plaintiff's motion to change placement. Also in August 2024, each of R.K.'s biological parents signed a termination of parental rights, and R.K.'s permanency goal was formally changed to adoption.

¶ 11 In September 2024, R.K.'s case management team conducted a clinical staffing to make a placement decision. Cathy Zeier, the program director for Youth Services Bureau ("YSB"), the agency contracting with the Department to manage R.K.'s case, led the clinical staffing. On September 24, 2024, the case management team concluded that it was in R.K.'s best interests to maintain placement of R.K. with her foster family. The decision was conveyed to plaintiff that same day.

¶ 12                          B. Plaintiff's Service Appeals

¶ 13 On July 2, 2024, while her motion in the juvenile court to change R.K.'s placement was pending, plaintiff filed a service appeal challenging the decision to place R.K. with the Crystal Lake foster family in April 2023. Following YSB's decision in September 2024 to maintain placement of R.K. with her foster family, plaintiff filed a second service appeal challenging R.K.'s continued placement with the foster family.

¶ 14 On September 6, 2024, the Department moved to dismiss the service appeals. In its motion, the Department argued that the administrative rules regarding service appeals do not permit appeals from all relatives, but only those who had care and custody of the child. Thus, the Department contended that despite plaintiff wanting placement of R.K., because R.K. had been placed in a traditional foster home and not with her great-aunt, plaintiff was not permitted to appeal the child's placement. In response, plaintiff argued that the administrative rules permit her to appeal because she "is a family member requesting services from the department," a category explicitly referenced in Department pamphlets regarding the service appeal process.

¶ 15    On October 21, 2024, the parties convened before the ALJ for argument on the Department's motion to dismiss. Following argument by the parties, the ALJ denied the Department's motion. The ALJ explained that after reviewing the Child and Family Services Act (see 20 ILCS 505/*et seq.* (West 2024)) and the Department's rules, that plaintiff's interpretation of the service appeal rules was correct because "[i]t seems clear that the legislature contemplates that the placement of a child with a non-relative will be appealable by someone." The ALJ continued, stating that "the way the rules are structured would make it so that a child placed with a non-relative would effectively be unappealable because relative caregivers can only appeal—can only do service appeals when they already have the child. And family members can only do appeals of changes in placement." Thus, there must have been an "oversight in the way the Department's rules were created such that people weren't thinking of how" to accomplish the legislature's intent for service appeals.

¶ 16    On November 26, 2024, the Department moved to dismiss plaintiff's appeal on timeliness grounds. The Department argued that plaintiff's service appeals were untimely, as she had 45 days to appeal from the time she received adequate notice of the Department's decision. The Department contended that plaintiff was aware of the Department's decision to place R.K. with the Crystal Lake foster family at the outset of this case, making her appeal months late. In response, plaintiff argued she never received adequate notice of R.K.'s placement or any other decisions regarding the child. Plaintiff further noted that there was pending legislation that would address the problem she was facing regarding the Department's decisions.

¶ 17    On December 4, 2024, the parties convened for argument on the Department's second motion to dismiss. The trial court determined that plaintiff's service appeal regarding the Department's April 2023 placement decision was untimely. However, by the time the parties had

convened for argument, the Department had rendered its September 2024 decision to maintain placement of R.K. with her foster family. The ALJ deemed the service appeal timely as to this decision.

¶ 18                              C. The Administrative Hearing

¶ 19    On December 12, 2024, the administrative hearing on plaintiff's service appeal of the September 2024 decision to maintain placement of R.K. with the Crystal Lake foster family commenced. The hearing was conducted over the course of three days: December 12, 2024, January 9, 2025, and February 5, 2025.

¶ 20    The Department called Cheryl H., Justin H., Laura Stocco, Kayla Milakis, Jessica Bartlett, Cathy Zeier, and Patricia Johnson to testify. Cheryl H. and Justin H., R.K.'s foster parents testified about their relationship with R.K. They explained that R.K. is treated as a member of their family and they are committed to fostering a relationship with her biological family if they are able to adopt R.K. They likewise testified about their efforts to schedule sibling visitation between R.K. and J.K.

¶ 21    Stocco, the Department's clinical manager for the northern region, testified that she prepared a consultation on permanency and placement for R.K. In her written report, Stocco noted that R.K. had formed a relationship with Rita K. and plaintiff through extensive visitation, which suggests that R.K. might be able to manage the stress related to a placement change. However, organizations such as CASA disagreed, and believed that R.K. would suffer and experience unnecessary trauma if she were removed from her foster placement.

¶ 22    Milakis testified that she was a caseworker with YSB and assigned to R.K.'s case at the time the child was born. She noted that Cheryl H. and R.K. had a "very nurturing" relationship and that R.K. looks to Cheryl H. "as a mother figure." Cheryl H. was very good at understanding R.K.'s

wants and needs. The two had a "very strong and secure bond." Milakis testified that it was her professional opinion that R.K. should be placed with her foster family.

¶ 23    Bartlett testified that she is a foster care supervisor for YSB and took over Milakis's role on this case. Bartlett prepared a presentation for the clinical staffing regarding R.K.'s placement. She noted that large consideration was given to the fact that R.K. had been in the foster home her entire life, so the Department needed "to be mindful of causing any potential trauma to a child," with a "big part" of that relating to R.K.'s bonds and attachment.

¶ 24    Zeier testified that she is the child welfare program director for YSB. She has collected opinions from 11 individuals regarding placement of R.K. and received the unanimous opinion that R.K. should remain in her foster placement. Zeier opined that it is in R.K.'s best interests to stay with her current foster family.

¶ 25    Johnson testified that she was the CASA volunteer assigned to this matter. She stated that it would be detrimental to remove R.K. from her foster family and that R.K. was in an ideal placement.

¶ 26    Plaintiff then called Dr. Nancy Mendoza, Rita K., and Dr. Shantelle Whitehead to testify. Plaintiff also testified on her own behalf.

¶ 27    Dr. Mendoza opined that when children are raised by kinship caregivers, it minimizes insecurity and trauma in the child. Dr. Mendoza testified that she had reviewed the materials in this case. She noted that based on her review, R.K. had a healthy, strong attachment to her foster parents. However, it was her professional opinion that R.K. should be placed with plaintiff because "being raised by a kinship caregiver has a lot of benefits and less drawbacks than being in foster care." When questioned by the ALJ about whether her research "distinguished the comparative benefits of being placed with a kinship family on the one hand from being placed with, A, a

generalized foster family or, B, an adoptive family," Dr. Mendoza replied that "we don't have a way of really recording that and understanding when they become adoptive parents versus, you know, just kinship care providers." She explained that adoptive families could be foster families or kinship relationships, and so this data is disregarded in the research. The ALJ then questioned if "adoptive families might be foster families or they might be kinship families, but it's disregarded basically as a variable?" Dr. Mendoza replied that this understanding was "[c]orrect." Further, Dr. Mendoza testified that she did not believe R.K. would suffer negative effects if moved but named mistrust in the developmental phase as a possible negative side effect. This includes losing trust in the people around her, including caregivers.

¶ 28    Rita K. testified that since the goal was changed to adoption, she has only seen R.K. once or twice a month. In contrast, she sees plaintiff a couple of times a month, plus on vacations, holidays, or birthdays. Rita K. believes that if R.K. were placed with plaintiff, she would see R.K. more. Rita K. opined that it was in R.K.'s best interest to be placed with plaintiff. This is because plaintiff is "well-respected in the community" and a "hard worker." R.K. would be part of the larger family unit and would have opportunities to travel with her biological family.

¶ 29    Dr. Shantelle Whitehead opined that it was in R.K.'s best interest that she be placed with plaintiff. She noted that she considered several factors, including attachment disruption, when coming to this conclusion. Dr. Whitehead indicated that she believed attachment to be flexible, and so any attachment disruption faced by R.K. in the transition from her foster placement to a placement with plaintiff could be repaired. She considered it "a fact" that there would be attachment disruption in removing R.K. from her foster home. She stated that the key to repairing the attachment disruption would be a gradual transition between homes. Additionally, she testified that "the one thing that [plaintiff] can provide that is more than the foster family, is that biological

connection" and noted that one study demonstrated that foster children in biological placements have better long-term outcomes than children in non-relative foster care placements. On cross-examination, Dr. Whitehead testified that the literature did not differentiate between biological and adoptive families.

¶ 30    Finally, plaintiff testified in support of her case. Plaintiff explained that she had been involved with R.K.'s biological parents prior to R.K. or her brother's birth. Plaintiff sees Rita K. and J.K. two to three times a month. When she sees J.K., he will ask her about R.K. Plaintiff also testified that she expressed a willingness to adopt both J.K. and R.K. on numerous occasions. Plaintiff submitted as evidence an email from August 1, 2024, expressing that sentiment. She completed the process required of her for placement of R.K. and J.K. Further, plaintiff explained that it was important to her that R.K. be surrounded by her biological family and "will see that the features she has, she resembles her brother, she resembles her cousin," and this "will create self-identity for her."

¶ 31    On February 28, 2025, the ALJ issued her written opinion and recommendation, determining that it was in R.K.'s best interest for placement to be maintained with her foster family. In issuing the written decision, the ALJ noted that the Department was required to prove by a preponderance of the evidence that the September 2024 placement decision was in R.K.'s best interests. The ALJ further noted that the Adoption Act and Department Rule 309.130 (89 Ill. Adm. Code 309.130 (2015)) "provide a clear path to resolution."

¶ 32    In finding that the placement decision was in R.K.'s best interests, the ALJ emphasized the "desire to avoid disrupting the child's secure attachment to the only caregivers she has lived with." The ALJ noted that R.K. has an attachment to plaintiff, but "that attachment is not as strong as the one she has developed with" her foster parents, and the interactions described by Milakis and the

foster parents "reflect a closeness and trust that weighs in favor of placing her with" the foster family. Additionally, the ALJ noted that the foster family "through their conduct for the last twenty-two months" had shown that they are committed to fostering the relationship between R.K. and J.K. The ALJ noted that if R.K. were placed with plaintiff, she may hear more often about J.K., but plaintiff lives much further from Rita K. and J.K. than the foster family. "The comparative ease of regular visits given [the foster family's] proximity suggests [R.K.] may see [J.K.] more regularly by remaining in Illinois." The ALJ noted that while the Adoption Act considers the preferences of the biological parents, and R.K.'s biological father expressed a preference for having R.K. placed with a family member, "the mere existence of biological ties is not enough to upend the preference the legislature requires the Department to give to foster parents who have cared continuously for [R.K.] for more than a year."

¶ 33    The ALJ further acknowledged that plaintiff presented expert testimony. However, the ALJ found this testimony to be of "limited persuasive force." First, the testimony of Dr. Mendoza "was premised on heavy support in academic literature for the proposition that children who are cared for by kin have better long-term outcomes than children who are cared for by foster families." The ALJ determined that this opinion was "undermined by the fact that in academic research on these issues, the role of adoption is either not considered at all, or *adoptive families are treated as kin*." (Emphasis in original.) Second, the ALJ noted that Dr. Whitehead's testimony "was focused mostly on whether [R.K.] would be able to recover from the trauma of moving her from the [foster parents'] home to plaintiff's." The ALJ noted that while "it may be true that it is a trauma [R.K.] is emotionally healthy enough to recover from, it does not really answer the question of whether the move would be in her best interests."

¶ 34                            D. Circuit Court Proceedings

¶ 35    Following the ALJ's opinion and recommendation, plaintiff filed a complaint for administrative review on March 25, 2025. Notably, she did not issue a summons at this time.

¶ 36    On April 24, 2025, the Department moved to dismiss plaintiff's complaint in administrative review pursuant to section 2-619(a)(9) of the Code of Civil Procedure. See 735 ILCS 5/2-619(a)(9) (West 2024). The Department alleged that plaintiff failed to comply with the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2024)) regarding the issuance of summons and service. The Department alleged that to date, plaintiff had not issued a summons and had not produced a certificate of service reflecting timely issuance and service of the summons. Citing *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 178 (2007), the Department argued that judicial review of an administrative proceeding is a departure from common law, and thus the procedures set forth in the Administrative Review Law must be strictly adhered to. Additionally, the Department alleged that the Administrative Review Law requires a party to file a complaint and issue summons within 35 days from the date that a copy of the final administrative decision was served on the party. 735 ILCS 5/3-103 (West 2024). Additionally, a party must serve the summons by registered or certified mail on the administrative agency by sending a copy of the summons addressed to the agency at its main office in the State. *Id*. Because plaintiff had not issued a summons within the prescribed 35 days, the Department moved to dismiss her complaint.

¶ 37    On April 28, 2025, plaintiff moved to issue summons and execute service of her complaint. Plaintiff noted that service had been executed via email to the Department on March 25, 2025, and that email was the method with which she was required to supply "all documentation during the administrative hearing below." Further, plaintiff alleged that until the Department filed its motion to dismiss, she "was not made aware by [the Department] that it required the issuance of the

- 11 -

summons or a different form of service." Additionally, she argued that the Department was not delayed in its receipt of her complaint and had been in communication with plaintiff regarding the adoption proceedings in juvenile court. Plaintiff argued that Illinois Supreme Court Rule 183 (eff. Feb. 16, 2011) allows the trial court to extend the time for a party to do any act upon good cause shown. Noting that issuance of a summons is mandatory, but not jurisdictional, plaintiff requested that the trial court hear the case on its merits.

¶ 38     The Department filed its response to plaintiff's motion to issue summons on May 27, 2025. The Department reiterated the Administrative Review Law must be strictly followed and that plaintiff should not be "absolved of the plain requirements of the Administrative Review Law because her counsel was in contact with undersigned counsel on another case." Citing to *Dorman v. Madison County*, 2023 IL App (5th) 220320-U, ¶ 28, the Department argued that "even a generous reading of Rule 183 does not excuse the failure to issue the mandatory, nonwaivable summons."

¶ 39     Plaintiff filed her response to the Department's motion to dismiss the complaint on May 28, 2025. In opposing the motion, plaintiff cited *Nudell v. Forest Preserve District of Cook County*, 207 Ill.2d 409, 422 (2003), for the proposition that "when dealing with a non-jurisdictional issue, as the issuance of summons, the courts have established a rule of statutory construction that will 'liberally construe a right to appeal so as to permit a case to be considered on its merits.' " Plaintiff argued that the administrative law rules regarding issuance of summons should be liberally construed so that the instant case could be heard on its merits before the trial court. She noted that "the purpose of the limitations period was to hasten the procedure in these types of cases," and that "[i]n the present case, if [the Department] was concerned about the need to hasten the procedure

- 12 -

in this case, [the Department] could have immediately advised plaintiff that it was not properly served."

¶ 40   Additionally, on May 28, 2025, plaintiff filed the affidavit of Maxwell Sharkey, one of her attorneys. In the affidavit, Sharkey stated that he "believed that proper service upon the [Department] was through the [Department's] electronic mail, as all service had been made between the parties throughout the administrative proceedings below." Further, he stated that representatives of the Department "acknowledge[d] receipt of the complaint and did not raise improper service as an issue within said proceedings or outside of the proceedings until it filed its Motion to Dismiss in this case."

¶ 41   The Department's motion to dismiss was heard before the trial court on June 16, 2025. The trial court denied the Department's motion, noting that there was "no dispute that the complaint was filed within the statutory time frame *** but the summons was not issued at that time." Further, while it noted that "there are certainly cases that have upheld a Court's decision to dismiss a case," it did not "believe that a court is required to dismiss the case for failure to issue a summons." The trial court noted that "[i]n this case, the record reflects that both parties were in communication at all times," and in the juvenile court there was a pending adoption proceeding. The trial court also stated that it believed plaintiff to have made "every reasonable attempt to comply with the [Administrative Review Law]," and her "effort to have a summons issued in response to the motion to dismiss and then delay to have this briefed *** was an attempt to comply with the [Administrative Review Law]." Additionally, the trial court found no prejudice to the Department and accordingly denied the motion to dismiss.

¶ 42   Following the denial of the motion to dismiss, the Department filed its answer in administrative review with the trial court on July 14, 2025.

¶ 43 The matter proceeded to a hearing on plaintiff's complaint on December 2, 2025. Following argument by the parties, the trial court determined that the decision of the ALJ was "arbitrary and capricious [and] not based on actual fact but based on their [*sic*] own view of the facts." The trial court opined that the ALJ "completely ignored their [*sic*] own administrative marching orders, which is to always consider placement with family first." Thus, the result was "entirely against the manifest weight of the evidence and clearly unreasonable, *** clearly erroneous *** [and] arbitrary and capricious." The trial court opined that it has "watched [the Department] do this exact thing over and over, and it disgusts me, absolutely disgusts me." Accordingly, the trial court granted plaintiff's complaint. Additionally, the trial court ordered that "the children [*sic*] are immediately to be placed with plaintiff."

¶ 44 The matter returned to the trial court on December 3, 2025, for the Department's emergency motion to stay execution of the trial court's ruling. The Department argued that the trial court did not have the authority to change the placement of R.K. after finding the administrative decision to be against the manifest weight of the evidence. The trial court conceded that "to the extent my order suggested that [the Department] was going to take the child and hand it over to plaintiff, that, I believe was not an appropriate order. But that does not affect the Court's finding that the administrative law judge's decision was clearly erroneous and against the manifest weight of the evidence." The trial court granted the Department's motion to that extent but did not amend its order to effect a remand to the Department.

¶ 45 Following the order of the trial court, the Department filed the instant appeal.

¶ 46                                    II. ANALYSIS

¶ 47 On appeal, the Department argues that: (1) plaintiff failed to comply with the mandatory summons requirement; (2) plaintiff lacked standing to pursue a service appeal; (3) its decision to

- 14 -

maintain R.K.'s placement with her foster family was in R.K.'s best interests; and (4) the trial court erred by ordering it to place R.K. with plaintiff, rather than remanding to the Department. Because we find that the trial court erred in denying the Department's motion to dismiss the complaint in administrative review based on plaintiff's failure to issue summons, we need not reach the merits of all of the Department's remaining arguments.

¶ 48    The Department argues that the circuit court erred in denying its motion to dismiss based upon plaintiff's failure to issue a summons within 35 days of the final administrative decision. In support of this claim, the Department notes that issuance of a summons is a mandatory requirement under the Administrative Review Law. See 735 ILCS 5/3-103 (West 2024). The Department notes that that while there is a good-faith exception to the rules regarding issuance of summons, this good-faith exception does not apply to plaintiff. In response, plaintiff argues that the rules of the Illinois Supreme Court allow the trial court to extend the time for the filing of pleadings or taking any action that is not jurisdictional. Thus, she reasons, it was proper for the trial court to deny the Department's motion to dismiss.

¶ 49    A section 2-619 motion to dismiss "admits the legal sufficiency of the complaint and raises defects, defenses or other affirmative matter which appear on the face of the complaint or are established by external submissions which act to defeat the plaintiff's claim." *Neppl v. Murphy*, 316 Ill. App. 3d 581, 584 (2000). We review *de novo* the trial court's ruling on the Department's motion to dismiss. *Pnevmatikos v. Pappas*, 2025 IL App (1st) 230739, ¶ 62 (reviewing denial of motion to dismiss under section 2-619 *de novo*); *Blumhorst v. Illinois Department of Employment Security*, 335 Ill. App. 3d 1075, 1077 (2002) (same).

¶ 50    The law controlling a proceeding brought pursuant to the Administrative Review Law  is well established in Illinois. "The Illinois Constitution grants an appeal as a matter of right from all

final judgments of the circuit court (Ill. Const. 1970, art. VI, § 6) but further provides that final administrative decisions are appealable only 'as provided by law' (Ill. Const. 1970, art. VI, § 9)." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 45. "A circuit court's exercise of review over a final administrative decision is thus limited to the specific dictates of the Administrative Review Law." *Id.* "In other words, a court exercises special statutory jurisdiction when it reviews a final administrative decision, and such jurisdiction is limited to the language of the statute conferring it and the court has no powers from any other source." *Id.* "Thus, whether dismissal of plaintiff's complaint was warranted depends on whether plaintiff strictly complied with the requirements of the Administrative Review Law." *Ultsch*, 226 Ill. 2d at 179.

¶ 51    Section 3-103 of the Administrative Review Law provides:

"Every action to review a final administrative decision shall be commenced by the filing of a complaint *and the issuance of summons within 35 days* from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision." (Emphasis added.) 735 ILCS 5/3-103 (West 2024).

The requirement that a summons be issued within 35 days is "not jurisdictional," but it is "mandatory." *Moretti v. Department of Labor*, 119 Ill. App. 3d 740, 744 (1983). In order to "warrant relaxation of the filing period" for a summons, "[a] litigant must show a good faith effort to have the clerk issue the summons within 35 days." *Id.* Here, plaintiff argues that in addition to "relaxing" the filing period upon the showing of a good-faith effort, the trial court is also authorized to invoke Illinois Supreme Court Rule 183 (eff. Feb. 16, 2011) to extend the time to issue a summons. Rule 183 provides that, "[t]he court, for good cause shown on motion after notice to the opposite party, may extend the time for filing any pleading or the doing of any act which is required

by the rules to be done within a limited period, either before or after the expiration of the time." Ill. S. Ct. R. 183 (eff. Feb. 16, 2011). However, "Rule 183's plain language indicates that it only applies to the time limits set forth by the Illinois supreme court rules." *Robinson v. Johnson*, 346 Ill. App. 3d 895, 905 (2003), *opinion supplemented on denial of reh'g*. "It simply does not apply to a statutory time limit." *Id*. Thus, unless plaintiff can show that she made a good-faith effort to have the clerk issue summons within 35 days from the date the decision sought to be reviewed was served upon her, we are without authority to relax the filing period for a summons.

¶ 52    Plaintiff notes that our supreme court has stated that with regard to the issuance of summons in an administrative appeal, "[a]n established rule of statutory construction in this jurisdiction is that courts will 'liberally construe a right to appeal so as to permit a case to be considered on its merits.' " *Nudell*, 207 Ill. 2d at 422 (quoting *Cox v. Board of Fire and Police Commissioners of City of Danville*, 96 Ill. 2d 399, 403 (1983)). However, "[a]bsent a good faith effort on the part of the plaintiff to name and serve a necessary party as required by the Administrative Review Act, dismissal of the complaint for review is required." *Gunther v. State of Illinois Civil Service Comm'n*, 344 Ill. App. 3d 912, 914 (2003). "An exception to the 35-day requirement for issuance of summons does exist where, *due to circumstances beyond the litigant's control*, the summons was not filed within the 35-day period." (Emphasis added.) *Hanke v. Department of Professional Regulation*, 296 Ill. App. 3d 825, 829 (1998). In order to demonstrate a good-faith effort, a litigant must "attempt[] to have the clerk issue the summons within 35 days and file[] the complaint within that period." *Moretti*, 119 Ill. App. 3d at 744.

¶ 53    For example, in *Cox*, 96 Ill. 2d 399, 404, the supreme court found that the plaintiff had made a good-faith effort to timely issue the summons where the plaintiff filed his complaint for administrative review, unsigned summonses directed to each of the proper defendants, and

affidavits concerning their addresses on the 35th day after service of the administrative decision but the clerk did not sign and send the summonses until the 36th day after service. The supreme court determined that the failure to issue the summonses within the time prescribed by the statute occurred through no fault of the plaintiff, but by error of the circuit clerk.

¶ 54 Likewise, in *City National Bank and Trust Co. v. Property Tax Appeal Board*, 97 Ill. 2d 378, 382 (1983), the supreme court found that the plaintiff had made a good-faith effort to issue summons when, on a Friday that served as the 35th day, he presented to the office of the clerk two complaints for administrative review. The summonses were not issued until the following Monday, but affidavits by the plaintiff and by the deputy clerk stated that although the summonses might not be mailed until later, they would be issued "effective" on the date the complaint was filed.

¶ 55 Conversely, courts have rejected application of the exception where the plaintiff offered no explanation for the failure to issue summons, the record failed to disclose any evidence of a good-faith effort to comply, and there was no indication that the omission was due to circumstances beyond the plaintiff's control. *Hanke*, 296 Ill. App. 3d at 829. Courts have further rejected application of the good-faith exception where an attorney for an agency was served with summons, but not the agency itself. *Gunther*, 344 Ill. App. 3d at 914-15. Further, it is not sufficient for a plaintiff to serve the defendant by email, as strict compliance is required. *Ocampo v. Illinois Civil Service Comm'n*, 2024 IL App (1st) 230667-U, ¶ 30 ("Plaintiff attempts to rely on the fact that he served defendants via electronic mail. However, the [Administrative Review Law] requires the issuance of summons, not service by electronic mail, and strict compliance with that requirement is, usually, required."). Because "Illinois case law is very clear that the issuance of summons for [Administrative Review Law] cases is 'both mandatory and nonwaivable,' " courts have also

upheld dismissal of an action where the defendant had accepted a complaint, but a summons had not been issued. *Dorman*, 2023 IL App (5th) 220320-U, ¶ 25.

¶ 56 Here, it is clear that plaintiff failed to issue summons within 35 days of receiving the ALJ's February 28, 2025, opinion and recommendation. Plaintiff filed her complaint for administrative review on March 25, 2025—within 35 days after receiving the ALJ's opinion and recommendation. But it was not until April 28, 2025, 59 days after receiving the ALJ's opinion and recommendation, that she moved for leave to issue her summons following the Department's motion to dismiss the complaint. On May 28, 2025, the summons still not having been issued, an attorney for plaintiff filed an affidavit and plaintiff filed her response to the Department's motion to dismiss. The response and the affidavit make clear that she "was not made aware" that the case required "the issuance of the summons." Plaintiff argues that the attorneys for the Department accepted service and she then attempted to issue summons through her motion for leave to issue summons. As explained above, the Department's acceptance of the complaint did not relieve plaintiff of her duty to comply with the Administrative Review Law's requirements and have summons timely issued, as the issuance of summons is mandatory and nonwaivable. See *Ocampo*, 2024 IL App (1st) 230667-U, ¶ 30; *Dorman*, 2023 IL App (5th) 220320-U, ¶ 25. Further, plaintiff's attempt to issue summons late does not fall within the narrowly defined good-faith exception. The exception "does exist where, *due to circumstances beyond the litigant's control*, the summons was not filed within the 35-day period." (Emphasis added.) *Hanke*, 296 Ill. App. 3d at 829. However, the litigant must "attempt[] to have the clerk issue the summons within 35 days and file[] the complaint within that period." *Moretti*, 119 Ill. App. 3d at 744. Here, plaintiff was unaware of the requirement and thus failed to have the clerk issue summons within the mandatory time frame. There was no attempt prior to the Department's motion to dismiss, and the circumstances were simply not beyond

plaintiff's control. Thus, the trial court should have granted the Department's motion to dismiss plaintiff's complaint for administrative review.

¶ 57    Even in the event that the summons had timely been issued and we were to address the merits of the case, the facts presented would compel us to affirm the conclusion of the ALJ. In reviewing a final decision under the Administrative Review Law (735 ILCS 5/3–101 *et seq.* (West 2024)), we review the administrative agency's decision and not the trial court's determination. *Bolger v. Department of Children and Family Services*, 399 Ill. App. 3d 437, 448 (2010).

¶ 58    "There are three types of questions that a court may encounter on administrative review of an agency decision: questions of fact, questions of law, and mixed questions of fact and law." *Id*. Indeed, the degree of deference afforded an administrative decision depends on whether the question considered is one of fact, one of law, or a mixed question of fact and law. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 29. An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct, and thus a reviewing court is limited to determining whether the agency's findings of fact are against the manifest weight of the evidence. *Bolger*, 399 Ill. App. 3d at 448. "An administrative agency's decision is against the manifest weight of the evidence 'only if the opposite conclusion is clearly evident.' " *Id*. (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)). The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. *Abrahamson*, 153 Ill. 2d at 88. The reviewing court may not substitute its judgment for that of the administrative agency. *Id*. If the record contains evidence to support the agency's decision, it should be affirmed. *Id*. Questions of law are reviewed *de novo*. *Medponics Illinois, LLC*, 2021 IL 125443, ¶ 29. Mixed

questions of law and fact are reviewed under the clearly erroneous standard. *In re Fatima A.*, 2015 IL App (1st) 133258, ¶ 60.

¶ 59    Mixed questions of law and fact are questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard. *Id*. This standard of review is deferential to the agency's expertise in interpreting and applying the statutes that it administers. *Slater v. Department of Children and Family Services*, 2011 IL App (1st) 102914, ¶ 33. An agency's decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Bolger*, 399 Ill. App. 3d at 448. In this case, we review the ALJ's underlying findings of fact under the manifest weight standard and the mixed question of law and the ultimate question of whether placement with the foster family was in R.K.'s best interest for clear error. *Slater*, 2011 IL App (1st) 102914, ¶ 33.

¶ 60    Under the Adoption Act, when a foster parent who has cared for a child for a year or more applies to adopt that child, their application shall be given "preference and first consideration *** over all other applications for adoption of the child." 750 ILCS 50/15.1(a)-(b) (West 2024). The Adoption Act then sets forth several considerations regarding the child's best interests, including: (1) the wishes of the child, (2) the interaction and interrelationship of the child with the applicant to adopt the child, (3) the child's need for stability and continuity of relationship with parent figures, (4) the wishes of the child's parent, (5) the child's adjustment to his or her present home, school, and community, (6) the mental and physical health of all individuals involved, (7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings, (8) the background, age, and

living arrangements of the applicant to adopt the child, and (9) the criminal background check report presented to the court. 750 ILCS 50/15.1(b) (West 2024).

¶ 61 Additionally, the Department's guidelines for placement requires it to consider various factors, including: (1) the wishes of the child under 14 years of age, who demonstrates maturity and cognitive ability to participate in the decision, (2) the physical, mental, and emotional needs of the child, (3) the child's need for stability and continuity of relationship with parent figures, (4) the interaction between the child and the prospective adoptive parent, (5) the prospective adoptive parent's ability to meet the physical, mental, and emotional needs of the child, (6) the prospective adoptive parents' ability and willingness to support, maintain, and continue to be sensitive to the child's significant relationships with the child's extended family, siblings, and any other significant persons who played an important role in the child's life or to whom the child has established significant emotional ties, (7) the results of an assessment of the child's capacity for attachment, (8) the consent of a child 14 years of age or older, and (9) the prospective adoptive family's willingness to help and support the child in developing relationship with his or her siblings, including siblings with whom the child does not yet have a relationship, and recognition of the value of preserving family ties between the child and his or her siblings, including the child's need for stability and continuity of relationships with siblings, and the importance of sibling contact in the development of the child's identity. 89 Ill. Adm. Code 309.130(a) (2015). The Administrative Code "reiterate[s] the importance of placing children together when possible, or in placements that will foster sibling relationships when not, and notes that consistent with the Adoption Act, foster parents who have cared for the child for a year or more should be given priority." 89 Ill. Adm. Code 309.130(b) (2015).

¶ 62    Here, the ALJ applied these factors to the Department's September 2024 placement decision. The ALJ noted that several of the factors outlined in the statute and Department rules are not relevant to the instant case, as R.K. is too young to express her own preference for a caregiver and too young to have school or community ties. However, many of the factors weighed in favor of maintaining placement with R.K.'s foster family. The Adoption Act and Department rules state that R.K.'s foster family must be given preference unless the remaining considerations would be contrary to R.K.'s best interests. See 750 ILCS 50/15.1(a)-(b) (West 2024). Further, the ALJ emphasized the "desire to avoid disrupting the child's secure attachment to the only caregivers she has lived with." 750 ILCS 50/15.1(b)(3) (West 2024); 89 Ill. Adm. Code 309.130(a)(3) (2015). The ALJ noted that R.K. has an attachment to plaintiff, but "that attachment is not as strong as the one she has developed with" her foster parents, and the interactions described by Milakis and the foster parents "reflect a closeness and trust that weighs in favor of placing her with" the foster family.

¶ 63    Additionally, the ALJ noted that the foster family "through their conduct for the last twenty-two months" had shown that they are committed to fostering the relationship between R.K. and J.K. 750 ILCS 50/15.1(b)(7) (West 2024); 89 Ill. Adm. Code 309.130(a)(6) (2015). The ALJ noted that if R.K. were placed with plaintiff, she may hear more often about J.K., but plaintiff lives much further from Rita K. and J.K. than the foster family. "The comparative ease of regular visits given [the foster family's] proximity suggests [R.K.] may see [J.K.] more regularly by remaining in Illinois." The ALJ noted that while the Adoption Act considers the preferences of the biological parents, and R.K.'s biological father expressed a preference for having R.K. placed with a family member (see 750 ILCS 50/15.1(b)(4) (West 2024)), "the mere existence of biological ties is not enough to upend the preference the legislature requires the Department to give to foster parents

who have cared continuously for [R.K.] for more than a year." 750 ILCS 50/15.1(b)(7) (West 2024); 89 Ill. Adm. Code 309.130(a)(9) (2015).

¶ 64    The ALJ further acknowledged that plaintiff presented expert testimony. However, the ALJ found this testimony to be of "limited persuasive force." First, the testimony of Dr. Mendoza "was premised on heavy support in academic literature for the proposition that children who are cared for by kin have better long-term outcomes than children who are cared for by foster families." The ALJ determined that this opinion was "undermined by the fact that in academic research on these issues, the role of adoption is either not considered at all, or *adoptive families are treated as kin*." (Emphasis in original.) Second, the ALJ noted that Dr. Whitehead's testimony "was focused mostly on whether [R.K.] would be able to recover from the trauma of moving her from the [foster parents'] home to plaintiff's." The ALJ noted that while "it may be true that it is a trauma [R.K.] is emotionally healthy enough to recover from, it does not really answer the question of whether the move would be in her best interests."

¶ 65    Based upon the foregoing, we cannot find that the ALJ's recitation of the facts in this matter to be against the manifest weight of the evidence. Here, we may not substitute our judgment for that of the ALJ. *Abrahamson*, 153 Ill. 2d at 88. Additionally, we find no clear error in the ALJ's application of the facts to the law. The ALJ recounted the facts and applied them to the governing law.  An agency's decision is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Bolger*, 399 Ill. App. 3d at 448. Here, we are not left with any such conviction. As the ALJ noted, the "close, loving, supportive bond between [R.K.] and [her foster] family was amply demonstrated by the testimony in this case: Cheryl [H.] and Justin [H.]; [R.K.'s] longtime placement worker, Ms. Milakis; and the family's CASA volunteer, Ms. Johnson, all provided detailed accounts of the caring and joyful interactions

between [R.K.] and [her foster family]." Accordingly, were this matter to have proceeded on its merits, we would still affirm the decision of the ALJ and reverse the order of the circuit court of Kane County.

¶ 66                                    III. CONCLUSION

¶ 67    For the foregoing reasons, we reverse the judgment of the circuit court of Kane County.

¶ 68    Reversed.

¶ 69    JUSTICE McLAREN, specially concurring:

¶ 70    I concur with the analysis relating to affirmance based upon the failure to issue summons in a timely fashion.